We'll hear Hine v. Sullivan. Counsel? May it please the Court, my name is William Janayko. I represent the petitioner of Helen Brandon Hine, and I'm also presenting an argument on behalf of all four petitioners as to the common issues. Ms. Dressner, as indicated by the clock, is going to use three minutes of our 15 minutes to address her separate and effective assistance to counsel claim. There's a reasonable likelihood that the false testimony that the prosecutors knowingly presented and failed to correct could have affected the judgment of the jury. And there's a reasonable probability that the undisclosed immunity letter and the Katherine Anderson statement would have affected the outcome. Let me ask you right away, tell me what's the false testimony? The false testimony is actually identified at page 44 of the excerpt of the record by the district court. And there are seven specific instances, and they're broken down into two categories. One are answers that were given in response to questions about whether or not Mr. McLaurin had immunity. The other category of questions in which he had immunity, in other words, whether he thought The words of the letter plainly gave him the opportunity to talk to the policeman, and I think it was an ADA, I can't remember, at that interview, without anything he said at that interview being used against him. And that's all the words said. Now, it appears that there was an extension of that to his testimony at trial, but I can't see where there's anything that was said that gave him transactional immunity, unless that California case you cited. I believe Judge Klein felt that until 1996, and Judge Myler, the trial judge, actually recognized this in the August 10th in-camera hearing. He explained to Mr. Simo when he brought in Stacey Williams' immunity agreement, which said use immunity, and Judge Myler said, Mr. Simo, there is no use immunity in California. It reverts to transactional immunity. And Mr. Simo, and this is an excerpt of record at page 268 to 269 during the August 14th hearing. That doesn't explain to me why the testimony of the witness was false. His understanding was that it was, in effect, that they weren't going to use and go after him for his testimony about marijuana, but his understanding was not that he was promised any kind of transactional immunity. So what is the legal concept, although I have a problem with even that, your statement in law and that, but I just want to understand what precisely answer did the witness give that was false? When he was asked whether or not he could be prosecuted for marijuana, he said that they reserved the option to do that. But they told him, and why is that false? Because the in-camera hearing that was conducted with the prosecutor explained to the court that prior to the July 10th interview, Judge Schrager, Mr. Simo himself said, I met with Mr. McLaurin and his lawyer because there was a concern about whether he would testify without transactional immunity. That's not what it said in my reading. That's not what the letter said. I agree, but that's not what the letter said. Absolutely, the letter did not say that. What Mr. Simo said to the judge in camera was Mr. McLaurin wanted transactional immunity, and he did not want to say that in the letter, even though he knew that that's what it was, in effect, because it would be used to impeach him and suggest that they were buying the testimony. That was in the prosecutor's mind, but we'll get to the improper conduct of the prosecutor here, but I'm still having trouble. You could never prosecute this witness for perjury. His understanding was, yeah, they weren't after him for the marijuana. They wanted to get the killings, but I don't understand why he's guilty of giving false testimony. Because there's a letter which says this is to assure you and your client. It's specifically addressed, it's not like the Hayes case where they have this secret deal where they don't tell the defendant or the witness. In this case, the letter specifically says this is to assure you and your client that nothing he says about marijuana will be used against him, even if you don't buy the non-prosecution part of that. He also gave false testimony about whether what he said could be used against him. He was asked whether what he said to the detectives could be used against him. He said he thought that it could be, and that was false testimony, as the district court clearly found. He also gave false testimony about what his motivation was for testifying, and the reason that testimony was false was because, again, if you look at the in-camera hearing, Mr. Simo said there was a concern he would not testify without immunity. Counsel, I'm having the same problem that Judge Trager is having with your argument. It's bifurcated in this sense. One question is what did the witness understand he had been promised? And you're arguing the second prong, which is as a matter of law, what did the prosecutor promise to the defense lawyer, which gets us into the Hayes problem. But I'm still hung up on the first prong, which is what was it that the witness said that was false? And you keep answering it with the second prong, and that's not helping me understand the falsity that you're alleging. There are seven specific things. One, that they reserved the option to prosecute him, that he did not receive any assurances that he would not be prosecuted. But the letter doesn't give him that assurance, does it? You're arguing as a matter of law that it amounts to transactional immunity, but the question is what did the witness understand? I understand, Judge Kleinfeld, but I think that what you have to remember is the defense was not provided with an opportunity to ask Mr. McLaurin, isn't it your understanding that this is transactional immunity? Would the questions then be, are you familiar with this California Court of Appeal case that turns use immunity into transactional immunity? No, Judge Kleinfeld. I didn't have that. If you didn't prove that, how could you prove he was lying? I don't want to get hung up on the transactional immunity because I think we still have the use immunity, and I don't want to waste my time on that. But let me just say one other thing, if I might, to that. The problem is that if they had known about this agreement, they would have been able to ask Mr. McLaurin, isn't it true that according to what Mr. Simoes said, you were not going to testify unless you got transactional immunity? That was the representation the prosecutor made to the judge. The materials at that point aren't about testimony. They're about talking to the police. McLaurin was saying they came to rob my electronics, as I recall, and he wouldn't talk about the marijuana until they said we won't use your statements in this interview against you. Judge Kleinfeld, that's what the letter says, but the in-camera hearing where Mr. Simoes explained the purpose of that meeting, what he says specifically is there was a concern he would not testify. Not that he would not be interviewed, but he would not testify without transactional immunity. That's in the in-camera hearing. And the chronology here is very important because remember what happens. May 26th, he has his last interview with the detectives. Silence. Radio silence. He hires a criminal defense lawyer. Never interviewed again, ever, until July 10th. Then he has the meeting with the prosecutor. What happens? He hires a lawyer. The lawyer looks at the case. The lawyer says my client's not testifying unless he gets transactional immunity, which is what Simoes represented. And then they have this meeting. Misty McLaurin might have denied that he was getting transactional immunity, but you wouldn't have not had to cross-examine him with case law. You could have said. The lawyer was promised. The lawyer may have wanted, but where was the lawyer promised transactional as opposed to use immunity? The letter, again. I read the letter as the use immunity. It says use immunity. I agree. But I think, again, and I don't want to get hung up on this because I think even under the use immunity, you still have false testimony here. That's where I'm at. I just can't make that leap, Mr. Ginego. You want to try to resolve an issue that even judges and lawyers to this day are not in agreement on, whether or not there was transactional or use immunity here using the words of this letter, and then you want to engraft that onto the testimony of Mr. McLaurin and say, well, he lied when he told the jury that he thought they had reserved the right to prosecute him, which if you read the letter literally is true. You cannot glean from the words use immunity with regard to what he tells the investigators to transform that into the witness thinking I got a complete immunity back? I understand, Judge Traumann, and I know that it's not in the letter. I was trying to put it together with the representations by Mr. Seema. But going to the use immunity, he again said he didn't think what he said could be used against him. And I understand the Attorney General tries to parse that by saying, well, that only applied to that interview. And I think we parse it in the federal system all the time. This is queen for a day immunity if I'm using East Coast terms correctly. That's what he got. He got a free pass to come in and tell the prosecutor what he knew on that day in question, and he said couldn't be used against him. That's what the letter promises. That's use immunity in the federal system. I'll move on to the use immunity argument. I mean, he still says that he thought that what he said to the officers could be used against him. Let me take this from a different angle. The typical problem that arises with deals with criminals who testify for the prosecution is we have good evidence against you, but we won't prosecute you in exchange for what they always put in the agreement, your truthful testimony against or in the trial of the guy we really want. Now, I can't see where there was any deal that said McLaurin had to testify in order to get his immunity, whether it was use or whether it was converted by operation of California law into transactional. It looks as though he never promised to testify. Also, his motivations are very different. All they've got him for most is possession of marijuana for purposes of distribution and not a huge amount. So it's not as though there are two murderers and they're getting one to roll over on the other. It looks as though he's not facing a huge danger, even if he didn't have a deal, and the deal does not require him to testify. So I don't see why it should undermine confidence in the outcome, which I think is how the test is worded. I think that for purposes of non-disclosure error, you're right, it looks at confidence in the outcome. And the reason that you cannot have confidence in the outcome without Mr. McLaurin being cross-examined about that, and if there's one thing that I would like to make clear to the panel this morning, it's the following. There is a link between the undisclosed immunity agreement and the outcome of the trial here and the jury's verdict. And the reason for that is the following. The attorney general says the use immunity agreement, let me accept that for the moment, came after his statement that he was robbed. Therefore, there's no connection and it wouldn't affect the judgment of the jury. The reason that's wrong in this case is put yourself in the position of the defense, and you've got this witness who is being portrayed to the jury as someone who has come clean. He's not acting out of self-interest. He's doing the right thing. He's a pure and honest witness. That prevents you from being able to show that his initial statement was motivated by self-interest. I saw that and I thought, well, maybe the prosecutor's marrying this guy, but out of 12 jurors, someone's going to figure out the kid is a bum. He's a marijuana dealer and hanging out in a silly fort selling dope. He says he's testifying because he's a good citizen. Who's going to believe that? Yeah, the prosecutor was gullible enough, but I thought that was such a weak part of the prosecutor's case. That was the only part. No, no, the critical thing was the fight. If they're going to buy marijuana not to steal it, why would he get in a fight? You don't get in a fight at the grocery store when the checker is slow. There's all sorts of reasons. There was bad blood between McLaurin because he didn't like Michael Holland. They were both high at the time. He might have misunderstood. It might have been that he wanted him to front the marijuana, not to steal it. Even the defendant who testified says they went into the fort without saying a word. So why would that lead to a fight? I mean, it makes no sense unless the guy was out there to rob. Well, Michael Holland went in first. McLaurin followed him into the fort. Jason Holland says he did not hear anything. So why is there a fight except the story that the witness told seems a lot more credible and one of the defendants testified he doesn't even say something that, you know, we wanted to buy, et cetera, and we were having a discussion. He agrees that they just marched in there in a fight. A fight broke out, and it was a fight. That's the point. And I think that if you can just ignore everything the prosecutor argued to the jury here and just say, well, it looks like it was a robbery, I don't know how you can reject everything the prosecutor argued about, why this witness should be believed here. I think that that jury can pick and choose and decide what it believes. The jury isn't limited to deciding whether the prosecutor is correct. The jury decides whether the charge is correct. Absolutely, Judge Feinfeld. But if they did not find McLaurin credible, how do you get to the felony murder here? If they really did believe he was just lying, conniving. All you need is to get to the felony murder, and I think what the jury undoubtedly found is these thugs went into the so-called fort to rob the dealer of his dope, and they got into a fight in the course of the robbery between the robbers and the victims and killed one of the victims of the robbery. Well, they were 14 years in. I think my client didn't have any, he had maybe a petty theft. I don't think anybody had a prior record, and they went there because they had been driving around the truck. Filardo had been there early in the afternoon, and they went back there. McLaurin might have perceived that this was a robbery, even if nothing was said. If they were going to buy marijuana, why did they try to rob the poor homeless woman in the park of the contents of her wallet? Judge Solomon, the only person who anyone says was involved in stealing her wallet was Jason Holland, and that's another thing. Remember, you've got four people coming to the fort here. In order for the prosecution to say that this was a felony murder, they had to prove that there was a concerted action. My client and Jason Holland were in the back of the truck. They weren't even talking to these people. They were all walking separately. By the time the other people got in there, there was already a fight. McLaurin might have perceived it. I'm not sure you're answering my question. Wasn't the purpose of introducing that other crimes or bad acts evidence to show that they had no money, and that's why they wanted to rob this poor, unfortunate woman of her purse? Judge Solomon, I don't think that it was introduced for identity and intent,  but anyway, Jason Holland took the wallet on his own. Why doesn't it go to intent? Pardon? Why doesn't that go to intent to commit a robbery as opposed to? You can't buy marijuana if you don't have the money to pay for the drugs. There was no showing that the other kids did not have money with them. I don't think it was used to show intent. Was there a showing that they did? I mean, the way it would show intent is, well, do they intend to purchase or rob? You can't use your Visa on marijuana. You need cash. So it shows intent to rob because at least one of them tried to get cash and couldn't, and we don't know about the other three. And that's precisely right about the other three. We don't know about the other three, and there was testimony that McLaurin would front the marijuana. Maybe he was offended that these kids came in there, and then they got into a fight right away. I mean, the problem is that it rests on McLaurin's credibility, and the defense was deprived of an opportunity. I don't understand why you would get into a fight with a merchant, whether he's selling legal or illegal goods, unless you're trying to rob him. Maybe McLaurin initiated the fight. It could have been McLaurin initiated the fight, and then he wanted to cover it up because he didn't want to get caught for selling marijuana. I mean, that is an equally probable explanation. I've been buying things for decades, and no merchant has ever socked me. Why would he get into a fight? Because McLaurin could have perceived them as wanting to do something that they did not intend to do. He might have been offended by Michael going in there. He might have construed the way that he looked incorrectly. There's all sorts of explanations other than a strong-arm robbery that was shared by the other three people who came in behind him. It has to make sense to a jury of 12, and I'm sure that that was a focus of argument. The record is very big, and I may have missed it, so I want you to educate me. Why would they get into a fight if it weren't for it being a robbery? Because McLaurin was upset with Michael Holland because Michael Holland was one of the persons who explained to other people that McLaurin had previously ratted out a bunch of kids. And McLaurin said, even during one of the interviews, I think that they may have been retaliating against me. It could have been that McLaurin immediately perceived this as an attack. He had been robbed before, and he immediately perceived this when Michael Holland came in. And you brought that out? Pardon? You brought that out, that argument, that it was possible retaliation? That was brought out, yes. So then what is it? The jury rejected it, so I don't really. Let me just turn. Okay, I'll review the District Court 7 findings, but I still have the problem of falsity. But there's another issue here. You represent both Micah and Jason. I don't understand how there was any suppression as to Micah. His lawyer was at the hearing, okay, where this immunity was discussed. It's in the record. True, there's a new lawyer, but I know of no case that says it's the prosecution's burden to tell every changed lawyer what the deals were with the prior witnesses. Judge Trager, Gant versus. It strikes me it's really an ineffective assistance counsel claim masquerading as a suppression, at least as to Micah. Judge Trager, the District Court at X versus Record 27 found that it was not effective disclosure, and the reason was because. Reviewing with the record, I can make it independent. They know both findings, and I don't buy that. How is that possibly suppression because the lawyer didn't bother to go read the record? He said something to the effect, well, I only looked at counsel. I didn't look at the lawyer's arguments. Well, this is hardly a lawyer's argument. No. Under Gant versus Roe, which is a Ninth Circuit case, I think that that says that that's not effective disclosure. The prosecution has a duty to turn over that letter. Apparently they did turn it over to Milioti. I don't understand why Micah didn't get it. But in any event, a defense lawyer has a duty to investigate. One of the things you think you would do for your client is read what happened at the prior hearing and read the whole record and see what's there. One would hope that, but I think that under the case law, the prosecution has got an obligation to turn over that letter, and they didn't. And I think Gant versus Roe establishes that. Mr. Janenko, you also mentioned earlier in your argument the witness Catherine, I forget her last name. Catherine Anderson. Am I correct in reading the record that her identity was disclosed during the trial and she was actually subpoenaed and answered the subpoena and was available at the courthouse to testify but was never called? That's correct, Judge Sloan. Where's the error here? The error here is there are notes of her interview that was taken by Detective Toussaint, if that's how you pronounce his name. There were notes of his interview. The district court correctly found, and I understand you can review the record, but the district court correctly found that Judge Meyer said you don't have to disclose the notes. What they did disclose was this handwritten statement, which is at Exegetive Record page 239, and that was disclosed. And here it says Chris said that they were going to get somebody. In his handwritten note of the interview, and he admitted that he had two sets of notes, in his handwritten note what he said is that Catherine Anderson, they were going to buy some marijuana. I can see why the girl wasn't put on a stand. They'd ask her, so did you say you were going to buy some marijuana? And she says, well, whatever I wrote in my statement. And the statement says get some marijuana and not buy it. And then after calling her as a defense witness, the defense lawyer has to impeach her by saying, well, the policeman wrote down that you said buy some marijuana. Could you have said that? And she says, well, maybe she says, well, what I wrote is what I wrote. Or maybe she says, I don't know. It seems like she's a useless witness, possibly harmful. In California, under Evidence Code 1235, a prior inconsistent statement unlike the federal system is admitted as substantive evidence. And so the defense would have been. What does get mean? Excuse me? What does get mean? Get could mean any number of things, I think. But what buy means is you're going to purchase. And so at that point, what you've got is a defense witness who herself has impeached herself in her own handwriting by writing get. So even if the jury thinks she told the detective orally buy, they also know that she wrote get. And it turns out to be better for the prosecution than the defense. I can't see why that should undermine confidence in the outcome. She did not write get. The detective wrote get. And my point is that what he did was she adopted the statement. He did. But what happened was that the detective had a set of notes from interviewing her. He wrote in there that they said they were going to buy. That's in his notes. When he then writes the statement, he changes it. Now, she signed it. It's his handwriting. Wait a minute. Didn't he testify at the hearing there that she might have used the word buy? He specifically said that she used the word buy in the in-camera hearing, but that was never disclosed to the defense. The whole case was whether or not they were going to go buy marijuana. And this witness says that's what they said they were going to do. How can that not undermine confidence in the jury? Do you really think that this witness would have been of great help to the defense, considering her relationship with the bodies? Judge Schrager, I think that because you would have been able to call the detective to introduce her statement as substantive evidence in California, the statement that they were going to buy marijuana, that would be critically important. It would have shed a whole new light on this case. A whole new light. You know at that point that they want to either take or purchase marijuana. You know that there's some ambiguity about what they said before they did it. You know that at least one of them tried to get some money from a homeless woman in the park. And you know that they got into a fight when the would-be purchasers or robbers confronted the possible seller or victim. Because you have a witness who says they said they were going to go buy marijuana. I mean, it couldn't be more straightforward and compelling than the word buy. I mean, that was the question that... That's not the only word. She did not use get. The detective wrote get in the statement that she then signed. I understand that's a problem. Witness to the stand and saying we know that you signed a statement that says get, but we know you didn't mean it because the detective wrote down that you said buy. That's what you've got, isn't it? I don't... Perhaps, but it's all speculation because the defense was never given the notes that she said buy. They could have put it on. She might have said, yes, they said buy. I signed the statement because I signed my name on page two. I thought he had written up what I said. It was midnight. I did not read it carefully. And I went ahead and signed the statement, but they really said buy. That's an equally probable explanation, and we never got an evidence. I'm still bothered by the fact that they subpoenaed her and they didn't call her. To me, that speaks volumes because I have to assume that a defense lawyer spoke with a witness that he subpoenaed to the trial. And based on whatever that conversation was, that lawyer made a determination that this witness is not going to help my case and I'm not going to call her. Judge Talman, I think that what the sequence is is that they subpoenaed her. And when... They, the defense. The defense subpoenaed her. When the prosecution learned that they had subpoenaed her, they then disclosed this statement from October 10th. That was in response to learning that they had subpoenaed this woman, they disclosed the statement. The defense got this statement, and it says she said they went to get marijuana. That could mean a lot of different things. We're not going to call her. We're not going to... What does the defense lawyer do at that point? The defense lawyer goes to the witness and says, what did he say? And then depending on how the witness answers that question, you may or may not confront the witness with the statement that you have to impeach. And you decide at that point whether or not this is going to be a good witness or not a good witness. Put yourself in the position... I am putting myself in the position. And the defense... You're suggesting to me that once the defense lawyer received that statement, they looked at it and said, well, I can't call this witness because look what the discovery showed. That isn't how it works, Mr. Janagel. That's not how defense lawyers try cases. They talk to witnesses that they've subpoenaed. And if they don't call them, it's because they're not going to help the case. There's nothing in the record about why they didn't call this witness. But what I'm suggesting, Judge Solomon, is contrast that with if you had gotten the notes where she said bye, you would then be able to go to her and say, Ms. Anderson, look at these. Does that refresh your recollection? Oh, that's right, I said bye. They said they were going to go buy it. Completely different case at that point because you've got this unexplained erosion that happens in there. The answer was, well, they said they were going to get the marijuana. But all I can say is that that's not what the quotes are in the notes of the detective that were not disclosed. And that's the whole case. There was a witness there who could have shed some light on the truth, and the witness was never called. And you're suggesting to us that because of the fact that the detective's other note was not disclosed, that we should think that our confidence in the outcome should be questioned. Absolutely, because you've got a witness that the prosecution knows said they were going to go buy some marijuana. They've got a duty to turn that over. I don't care if she signed a statement saying she said buy marijuana. You've got a duty to turn that over. The whole case is about whether she was going to buy marijuana. How can you not disclose that? Why didn't somebody say in the hearing, oh, my God, she said buy? It would have made a huge difference in the case. It would have completely shed a different light on it, and I don't think you can withhold that. If the jury thought that the detective was not only very honest but also very careful in writing down what witnesses said to him late at night, and that the detective was very sensitive, as a good lawyer would be in the morning, to the significance of the words used, but not sensitive enough to write them down carefully in the statement for a signature. Given what occurred in this case, you could easily argue that the transformation from buy in the notes to get in the statement that they turned over was not an accident. And I know I'm well over my time, and I appreciate you allowing me to... We used up the time because we were interested in your case. Yeah.  Thank you for the argument. Thank you, counsel. I still have my time. Yes, we'll have yours. Tracy Dressner on behalf of Petitioner Tony Migliotti. Mr. Migliotti is situated a little differently because we know that his attorney had the immunity agreement but simply did nothing with it. And the reason it made a difference was because Mr. McLaurin did not tell the story that he told at trial about this case involving a robbery of marijuana until after he secured the letter. I thought about that, and it looked to me as though this kid, Migliotti actually had a pretty good case because he didn't go into the fort. He had a darn good case, and he had a lousy lawyer. And my thought was if his lawyer manages to establish, as he succeeded in doing, that Migliotti did not go into the fort, he's got a pretty good shot at the jury letting Migliotti off because even though he went along that far, he didn't go into where the stabbing took place. With that circumstance, it makes a lot of sense for the lawyer not to muddy up his own case. He wasn't even there with an impeachment that might fail or be confusing to the jury. He's got what's best, which is his client never entered the fort. So why would he introduce something that's second best, a kind of questionable impeachment? Because not entering the fort really wasn't determinative. This case was tried as an aiding and abetting case. I have yet to see a case where jurors make that distinction when you have a case that was tried as a group activity as this case was. The whole premise of this case was that that made this a first-degree murder and first-degree murder special circumstance case was that there was a robbery of marijuana.  And that's the point. And this actually goes to the falsity claim too. At pages 681 and 682 of the record, Mr. McLaurin testifies. He was asked, did there come a time when you felt ready to tell the truth about your involvement with marijuana, the extent of your dealing with marijuana? Yes. What brought that about? Quote, my lawyer told me that I wasn't going to be able to get these guys until I told the whole truth. That was a falsity and that was also the impeachment that should have happened. The truth was it wasn't because he wanted to get these guys. The truth was he would not speak to them. That's an argument. We don't know that, what was in his head. But that never, the jury never learned that. Most of us have multiple motives for most of the things we do. The jury never learned that he would not speak to the prosecutor or that he never told the story about the marijuana until after he secured that letter. There are a couple things wrong with your argument that occurred to me. One is most of us have multiple motives. He probably did want to get the guys. He probably was not real fond of people that tried to rob his marijuana stash, let alone stab him in his head. You also told him that he, you know, he wasn't promised that he'd have immunity, but he hadn't been prosecuted and that he had been told that they really weren't interested in him for the marijuana. Also, it really, the critical thing was did they come to buy or to steal? No. And what he said before he got immunity was they came to steal my electronics. A lie. And after he got immunity, he said they came to steal my marijuana. But the robbery story was consistent. It was not. And if you give me a minute, I'll get to the other two prongs of my ineffective assistance counsel claim. There are two related aspects that were not brought out by counsel. One is that the jury never learned that Mr. McLaurin's Ford had been robbed previously, had been burglarized previously. And that Mr. McLaurin was sort of predisposed to worrying that his valuables that he felt very strongly about were going to be taken. He felt so strongly about that, that while he's bleeding and while his best friend is lying on the kitchen bleeding, he sends his mother out with the keys to go lock up his Ford. This is a guy who's concerned about his valuables and has that mindset that he's going to be robbed. So he's got that in mind to begin with, but the jury never learns that. And two, that the chronology of what happened. The jury didn't learn about this? I'm sorry? The jury didn't learn about him going back to lock up? They learned about the mother going back, but they never learned that he had prior experience with having his Ford burglarized. So that's the ineffective lawyer. Because it all flows, let me follow you. You've got this predisposition, you've got this pre-thought that somebody's going to come to your Ford and steal from you. And the chronology of what he told law enforcement was, the very first thing he said was, they said to me I want your TV or VCR or there is going to be a fight. That's what he tells them the first time. Second time he tells somebody at UCLA security there was a fight. Third time he tells a social worker at UCLA there was a fight. The fourth time is the big conversation with the cops at the, with the detectives at the hospital. And he says, this is the first time he says, Micah grabbed the drawer and asked for the keys. Then he says, they were there to get my video games. And this is in the chronology of the transcript. Then he says, they came to get my TV, my VCR, any of my new stuff, maybe even a little marijuana to go with it. Then they have a whole discussion about how he has marijuana for possession, that he smokes dope himself. And then he says, they came for my video games and boxing stuff. I have a lot of nice stuff in my fort. He, even at that point, McLaurin tied the shaking of the drawer, which was the first time he ever said anything about that, to stealing the electronics. He said, I had my key to my electronics. Now, the way this case shapes out, interestingly enough, in the police summary of that transcript, there is not one word about electronics, VCR, TV, anything. The only thing that the police write in the summary is that McLaurin said he kept marijuana in the desk drawer that Micah tried to open. Then that's the last that anyone hears from McLaurin until he comes to trial. I don't know if you heard me. You're three and a half minutes over time. Can I just, another second to wrap up this argument? Of course. Then he comes to trial and he tells this whole story about the shaking of the drawer and the marijuana, and that story never coalesced until he got the immunity. He would not, and then the police, he desperately wanted the immunity, so much so that he hires, he's the victim, he hires a criminal defense lawyer. You're arguing ineffective assistance, right? I'm sorry? Your issue is ineffective assistance, right? Yes, but the prejudice from that is the same prejudice that ties in with the Brady violation, that ties in with the false evidence claim. And very lastly was the failure to put in the evidence that there was no fingerprints found. Here you have the only evidence that could have backed up McLaurin's story was that he had touched the drawer. He even described how the scene was dusted, was it not? I'm sorry? The crime scene was dusted by the. . . Was dusted and they found no prints, but the jury never. . . No prints. But the jury never heard that. So that, because there was nothing found, right? But the absence of fingerprints where you'd expect to find them is itself something. . . The government goes and says the nature of the material, you don't get fingerprints on those. . . Well, that may be, but we don't know that because counsel never bothered calling the. . . Well, that's not. . . Calling the fingerprint expert to establish that. Thank you, counsel. Counsel. Well, you're not going to get away with it so easily either. My question to you is, in the part, I don't believe there was false testimony, but the prosecutor in his summation here basically allowed, made a completely false argument, namely that the client, I mean the witness rather, his witness, was in fact, you know, open to prosecution. That wasn't so at all because, A, he had use immunity, B, the prosecutor believed him, and the only way he would be open to prosecution is if the story he was telling on the stand, which the prosecutor thought was true, was a lie. Now, putting aside the false testimony, the suppression, you know, how can I ignore that? The prosecutor, Your Honor, did incorrectly, falsely argue that McLaurin opened himself up to criminal liability with his own testimony. But the jurors here were well aware of McLaurin's involvement with marijuana, the fact he had retained an attorney to protect him from prosecution for marijuana, and the fact that he was never prosecuted for marijuana. Additionally, McLaurin's testimony here, the key aspect of his testimony that Petitioners had attempted to rob him, was corroborated by substantial independent evidence. Like? When Petitioners arrived at the fort, they were coming from another theft, and the circumstances of that theft showed that all of the Petitioners were involved in or present during that crime. It's a real problem dealing with a case where you have very substantial misconduct by prosecutors, but the evidence is still pretty solid for guilt. We don't seem to have a very good mechanism for disciplining prosecutors. I am very troubled by the prosecutor's misleading statements to the jury, false statements to the jury. I'm also very dismayed by failure to produce documents. That's how you convict innocent people. I can't understand why a prosecutor would do that. Your Honor, in this case, as the State Court found, there were errors made by the prosecutor. It's not errors. It's not errors. This isn't – they're not errors. They're wrongs. They were wrongs. They were false statements. A lie is not an error. A lie is a wrong. In argument and in questioning witnesses, as the State Court found, that there was no Brady violation here and there was no presentation of false testimony. In other words, the falsities that existed go nowhere beyond the State appellate record. In other words, the arguments of the prosecutor in rebuttal argument and his questioning. I can't think of an excuse for not producing that letter to everybody long before trial. It should have been produced, but there was no constitutional error. I believe it was an – Your Honor, I really find it – was there ever an exploration of why it wasn't turned over because – and there's this discovery hearing in which he refers to the letter. Melati gets it. I mean, is it – you know, is this just totally gross, reckless negligence? I mean, I can hardly believe it was intentional since he did hand it over to at least one of the defendants. It appears that it was inadvertent, Your Honor. As Your Honor pointed out, Counsel for Tony Meliotti did receive a copy of that immunity letter as a part of discovery during the juvenile fitness hearing. Additionally, the record reflects that the prosecutor disclosed the existence of and the content of that immunity letter to Counsel for Michael Holland at the juvenile fitness hearing on the same charges. Although the district court found that the prosecutor did not hand over that letter to trial counsel for Tony Meliotti, Brady – I'm sorry, for – I have two problems with this argument. One is that under Brady it doesn't matter whether the error is intentional or inadvertent. The second is I don't see how you make inadvertent errors unless you're picking and choosing what to turn over and not either very carefully going through all the files or else just turning over everything. I've never prosecuted. I only defended. And the good prosecutors used to just hand me the file. That would have been – They didn't want to convict somebody who was innocent, and they also didn't want to commit a Brady error. Again, Your Honor, it does appear that trial counsel for Petitioners Jason Heine – I'm sorry, Jason Holland and Brandon Heine did not receive a copy of that letter, but that letter was not material within the meaning of Brady. And for this reason, that immunity letter was – I think you may have an argument on the prejudice prong of Brady, but it's hard to see how you can say that the letter could not have any usefulness for impeachment. I do not dispute that, and I did not dispute that in the brief. So there was a Brady violation. The question is whether or not there is constitutional prejudice that flows. Yes. So that's the issue that we have to wrestle with. Yes, Your Honor. So you would concede, at least with regard to two of the defense counsel, that there was a Brady violation? That the letter had impeachment value and that it was not disclosed. Not disclosed. Correct. However, the letter was not material as to them. And that argument is this, that that immunity letter was not a new and different ground for impeachment in this case. Many of the same ingredients for attacking McLaurin's credibility had already been brought out at trial. The jurors here knew that McLaurin used marijuana on a daily basis, and that he sold marijuana, including on school grounds. They knew that he had initially lied to the detectives about selling marijuana. They knew he was initially untruthful about marijuana until he retained an attorney to protect him from prosecution on marijuana. They knew he had never been prosecuted for marijuana, and they knew that he had even come to court high when he had previously testified in a case. So the immunity letter here did not have unique impeachment value, and it would have added little to the cross-examination. Ben, can we go back to Judge Trager's question? Okay, given all of that, what do we do with the fact that at closing, I believe it was Deputy District Attorney Lattin vouched for Mr. McLaurin and did not set the record straight that there was, in fact, an immunity agreement, at least with regard to the statements that he gave, both to DDA, CIMO, and which arguably covered his testimony at the trial? The analysis would be a harmless error analysis, Your Honor, because the statement by the prosecutor was a false statement. McLaurin did not, in fact, open himself up to criminal liability. But again, in light of the record in this case, in light of what the jurors knew, in light of the substantial corroborating independent evidence of the key issue in this case, which was the intent of the petitioners when they entered the courtroom. Listen, I'm having a hard time squaring your answer with the representation made to the jury in closing argument that when Mr. McLaurin got up on the witness stand, he exposed himself to criminal liability by his testimony when, in truth and in fact, the July 10, 1995 letter protected him from what he said on the witness stand. The entire content of the statement was that McLaurin was a credible witness because he had opened himself to scorn, ridicule, embarrassment, humiliation, and criminal liability. Yeah, prosecution. And it's that and criminal prosecution that is just flat out a lie. It is a false argument, Your Honor. The rest is just fluff. He didn't open himself up to scorn. He opened himself up to being portrayed falsely by the prosecutor as a hero. The prosecutor had to make an argument, his base argument, based on the witnesses that he had. Arguments based on truth are always better. Of course, Your Honor. The testimony, I mean, excuse me, the argument here by the prosecutor was false. The prosecutor also invited the jury to have contempt for defense counsel and reject what they said because of an imputation of bad character, as I recall. The State Court found, and reasonably so, that the prosecutor made improper arguments, which were in the nature of attacking the Integrity Defense Counsel. But as the State Court reasonably found in this case, those arguments did not rise to a due process violation.  He's a judge. Do you want to withdraw the question? Well, that's a closer. I want to emphasize, Your Honors, that the trial court in this case was vigilant against prejudice. It promptly ruled on the objections of defense counsel. It very promptly also specifically instructed the jurors that the prosecutor's argument was the product of a strong belief in conviction, but the argument that the case was about the evidence. The court also instructed the jurors that there was no evidence of any misconduct by the defense attorneys in the case. And these complaintive remarks, particularly the one false argument made by the prosecutor, was not extensive. It was one brief remark, although false, one brief remark in a very lengthy rebuttal. In a case where the evidence was very strong, the prosecution's case and the defense case, as the State Court found, was unbelievable. And again, other than the Mulder incident, which I addressed a little earlier, the fact that a fight broke out at the fort shows that the intent of the Petitioners was to rob McLaurin. Initially, they hopped over his fence. Chris Villardo parked his car in such a way that it would not be detected. Additionally, a jogger saw Petitioners leaving the area of the fort with smiles on their faces. This relaxed and happy demeanor on their part was inconsistent with the idea that they had come to make a purchase and were confronted by an unforeseen physical assault. With regard to the Katherine Anderson statement, which was discussed earlier, initially, Petitioners Jason and Micah Holland should not be heard on this claim. Although they purport to have joined in this claim in their traverses, a traverse is not a proper place to make a new claim. And even if this Court were to treat those traverses as properly filed amended petitions, this Brady claim did not relate back to any claim in their petitions and was raised for the first time long after the statute of limitations had expired. In any event, on the merits, the record shows that Detective Toussaint's notes regarding his interview of Katherine Anderson were disclosed to the defense at trial. And those notes were taken contemporaneously with this conversation with Katherine Anderson and are the best reflection of what actually transpired during that conversation. In fact, Katherine Anderson signed those notes indicating that that was her statement. Had she disagreed with the terminology used in the notes, she could have asked that it be changed or simply refused to sign the statement. Also, Petitioners could have called her as a witness at trial and asked her regarding the meaning of the word yet as used in that statement. But in the absence of these measures, that statement was not exculpatory. It does not indicate that Petitioners went to buy marijuana from McLaurin. Who was the prosecutor who didn't turn over that statement? I'm sorry, Your Honor? Who was the prosecutor, I forgot, who didn't turn over the notes? They were turned over, Your Honor. They were turned over during the trial. No, I meant the policeman's notes. The policeman's notes were, in fact, disclosed to the defense at trial. Well, there were two sets of notes. No, I thought the written statement was disclosed at trial, and the judge said, you don't have to turn over the policeman's notes. The district court found that it was incorrect, and we raise this point in our reply to Petitioners' objections. The only notes that exist are the notes which are part of the excerpts of record here. What counsel is referring to is an in-camera discussion between the court and Detective Toussaint. And during that in-camera discussion, Detective Toussaint was referring to the very same two pages of notes that had already been disclosed to the defense at trial, and he was providing the court with an oral summary of his best recollection of that Katrin Anderson interview. So there isn't another set of notes that he went back and prepared at his office? No, Your Honor. In fact, he was ordered to turn over all of his notes to the defense, with the exception of some tangential privilege material relating to Jason Holland's time as a fugitive. Are you saying there's not a piece of paper where he wrote down what this woman told him as he interviewed her? There is. That is a part of the excerpts of records at those two pages of notes, and those were disclosed to the defense during the trial. Those are the notes that she signed at the bottom. But there wasn't a separate piece of paper where the detective wrote or subsequently typed or dictated his recollection of the interview? No. The only place where the word by is used is when Detective Toussaint orally says that, orally gives that summary. Orally said it to the judge? Yes. In chambers with counsel there? Not defense counsel. It was an in-camera hearing with the detective, between the detective and the court, and the prosecutors, one of the prosecutors was there. But he didn't use the word by in anything created more or less contemporaneously with the interview? No. I didn't understand that. Although there was some discussion, I think, at that hearing about his investigation log, which is what he was trying to track down a fugitive after the ---- And those were turned over to the defense with the exception of blocking out or taking out those portions that had to do with that separate investigation. Okay. But the only notes were those notes which were actually disclosed. Thank you. That clarifies it. Thank you. Unless the Court has any questions, I'm going to submit. Thank you. Thank you, counsel. May I make just two brief points in rebuttal? Go ahead. First of all, the Katherine Anderson ---- You've run through all your time, but I'll give you both attorneys for the defense a few moments for rebuttal. Thank you. Two points that I really want to make. One is the Katherine Anderson statement. Their contention is that when he was quoting the witness in the transcript, and this is at page 312 of the excerpts of record, that he was actually summarizing the written statement. If you ---- and I invite the Court to do this. If you take the written statement, which is at page 239 of the excerpts of record, and then you line up what he reads into the record at excerpts of record 312, it cannot be a summary. And I think that's what the district court found, that there were notes that he had written up. He had a separate set of notes. It's not the chronologue. It's not the chronologue that he kept? The chronologue is the first thing you get in any murder investigation. It's right in the murder book. I mean, it's turned over right away. He had a separate set of notes that he kept. Here's what I did. That's exactly right. And that was turned over, but that's not what he was referring to. He had a separate set of notes that he kept. How do we know that? How do we know that? Excuse me? How do we know that? He said that during the in camera. He said, I kept a separate set of notes. And that's what the Court found. And the Court said, you don't have to turn over your notes. And the district court found that there were notes and that there was this written statement. And if you match them up, he could not have been summarizing them for a couple reasons. But one of them is because of the bot. But also because in the written statement that they say that he's summarizing, the witness says that she found out that night, midnight, about this event. In his notes, he actually said she didn't find out until the next day. I mean, there are major discrepancies between those two things that can't be a summary. The second point I want to come back to is the closing argument and the misrepresentation or the lie. And the reason that's important because if you look at that misrepresentation, it really exacerbates the prejudice having to do with the jury not getting the complete picture. I understand they could have seen McLaurin as a scumbag teenager, whatever the pejorative term you want to use to exploit him, as someone who was not worthy of belief. But the fact is that the verdict credited his testimony. And what happened here was that when they say all of this impeachment evidence, that he sold drugs on school grounds, that he had marijuana for sale, all of this stuff that impeached him, that was a reason to find him credible because he was exposing himself to that liability. So in a very perverse way, that actually enhanced his credibility. They're saying, well, he was impeached on other grounds. The prosecution said, look him. He's admitting to all of this stuff because he's a good guy. He's a hero. And, Mr. Yudango, as to that point, don't we have to apply ad pedeference because that was addressed by the California Court of Appeal in its decision? The reason you don't have to do that, Judge Talmadge, is because they did not know about the Brady letter and they did not know about the Katherine Anderson statement. And so they did not know that that argument was false. So all they were passing upon was the effect of the misconduct in argument. That's exactly right. That's exactly right. So there's a huge difference. Once you have that, it's like a different case. And I appreciate the extra rebuttal time. Thank you very much. Thank you, counsel. The prosecutorial misconduct in this case was rampant, not just the Brady. However you want to characterize McLaurin's testimony, the fact is with the prosecutor's assistance, that jury never learned that he would not talk until he got the immunity, whether it was false, whether it was a misrepresentation, it was an omission. The prosecutor had a hand in keeping that information from the jury. I'm having a lot of trouble. The whole story sort of came out. Why? The story never came out. What precisely did not come out? Jury never learned that Mr. McLaurin would not, never told the story that they were there to steal marijuana until after he secured that letter. They said they told him they're not interested in marijuana. But you have to assume this was a 16-year-old. I'm sure he wasn't a murder suspect. To a 16-year-old, he was very concerned about being prosecuted for marijuana selling. And I think that came out pretty clearly. And he got, and he would not talk to them. CMO says that. The prosecutor says that. He said that to the judge in camera. He said it on videotape in a documentary in this case. Until we got a lawyer to tell him. But I don't understand. All this, the jury clearly, I mean. The jury, there is nowhere in the record where the jury learned that he did not talk to the prosecutor and tell the story that they were there to steal marijuana until after he secured that letter. That is nowhere in that record. And I would defy the court to be able to find anywhere in that record where that came out. And that's critical. Because he never told, he told a whole bunch of different stories. The nice, clear, consistent story that they were there to steal marijuana did not come about until after they got that immunity letter. And we have Mr. CMO testifying. What would the difference be? I mean, suppose they had been there. Suppose that they had been there to steal electronics, steal the TV and the VCR and some video games. What would have mattered? Because that's a lie. Because it's a lie. They weren't there to steal that. But all that matters, what matters is not what they were there to steal. What matters is that they came to rob rather than purchase. But where does that come from? It comes from McLaurin. That's the only evidence that it comes from McLaurin. You can't say that because some teenagers got into a fight. They must have been there to rob. McLaurin, by his own testimony, had gotten an 80. They're not interested in the marijuana. So at that moment he understood that they weren't after him. McLaurin himself testified that he had been involved in at least 20 fights in the prior year. This was a kid who was prone to getting into fights. Teenagers fight for all sorts of reasons. He testified to that. Oh, yes, he did. He talked about it quite a bit. He was in fights all the time. And so then the defense counsel had something to argue with in summation, that this kid, you know, was a hothead who could start up a fight for no reason. If I could finish on the prosecutorial misconduct, that there's the Brady, there's the failure to bring the evidence to the jury, there's the repeated misrepresentation. It's not Brady as to your client. No. But it's all part and parcel of the prosecutorial misconduct in this case. There was also the gang issue misconduct. And this Court, regarding the absolutely false statement that Mr. McLaurin had subjected himself to criminal liability, not only did he make that false representation, but then he used it to repeatedly say that the prosecution had put on a pure, honest case contrasted with those lying defense counsel. When, in fact, it was the prosecutor who was the lying, dishonest one. And just this last month, as we said in our Rule 28J letter, this Court reversed a conviction on this exact same reason, because the prosecutor in closing argument, quote, asserted as fact a proposition that he knew was contradicted by evidence not presented to the jury. He knew, our prosecutor knew that there was an immunity agreement, and he was not subject to criminal liability. He lied about that in closing. And this Court said, we do not lightly tolerate a prosecutor asserting as fact to the jury something known to be untrue or, at the very least, that the prosecutor had strong reason to doubt and reverse that conviction. Thank you. Thank you, counsel. Thank you. Kine v. Sullivan is submitted, and I think we'll take a five-minute recess.
judges: Trager, Kleinfeld, Tallman